UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| **J.D. KIZER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 10-2922-STA-tmp** |
| | ) | |
| **AMERICOLD LOGISTICS, L.L.C. and** | ) | |
| **DAN PRITCHARD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Americold Logistics L.L.C.'s ("Defendant") Motion for Summary Judgment (D.E. # 21), filed on February 29, 2012. Plaintiff filed a Response (D.E. # 24-25) on April 9 and 10, 2012. Defendant filed a Reply (D.E. # 27) on April 23, 2012. For the following reasons, Defendant's Motion is **GRANTED**.

## BACKGROUND

Defendant "is the largest provider of temperature-controlled warehousing distribution services in the United States;" it stores and transports frozen foods. (Def.'s Statement of Material Facts, D.E. # 21-2, at 1.) Plaintiff, an African-American, began working for Defendant on April 9, 1998 in a maintenance position at Defendant's Memphis facility located on East Parkway. (*Id.*) Throughout his employment with Defendant, he received various policies, including those prohibiting discrimination and harassment, and he signed documents acknowledging his receipt of those documents. (*Id.*) In 2006, Defendant promoted Plaintiff to

1

the position of Facility Service Manager ("FSM") at its plant in Arlington, Tennessee.  (*Id.*)

Plaintiff was terminated from his employment with Defendant on March 11, 2008.  (*Id.* at 9.)

Plaintiff then filed a charge of race discrimination with the Memphis branch of the

EEOC, and the Notice of his Right to Sue issued on September 21, 2010.  (D.E. # 1-2, at 2.)

Plaintiff filed his Complaint alleging violations of Title VII of the Civil Rights Act of 1964

("Title VII") sections (a)(1) and (a)(2), the Tennessee Human Rights Act ("THRA"), 42 U.S.C. §

1981, and intentional infliction of emotional distress ("IIED").  (D.E. # 1.)  After Defendant filed

its Answer on February 23, 2011 (D.E. # 6), the docket reflects very little activity until

Defendant filed the Motion for Summary Judgment now before the Court on February 29, 2012.

(D.E. # 21.)

The following facts are undisputed for purposes of this Motion unless otherwise noted.

Defendant's Arlington facility is referred to as the Arlington Rich facility because it focuses on

Defendant's customer, Rich Products ("Rich").  (Def.'s Statement of Material Facts, D.E. # 21-2,

at 2.)  When Plaintiff was promoted to FSM, he reported to the Arlington plant's General

Manager, Jack Moyer ("Moyer").  (*Id.*)  Moyer was not the best manager to whom Plaintiff

reported; his knowledge of plant details and ability to ensure that subordinates had the necessary

equipment and resources were lacking.  (*Id.*)

As FSM, Plaintiff was responsible for the proper maintenance of the Arlington's

facility's key equipment, and he made sure that that equipment was kept to the customer's

specifications.  (*Id.*)  Specifically, Plaintiff kept track of the facility's refrigeration and other

equipment such as condenser units, evaporators, freezers, dock bumpers, and trucks which were

critical to Defendant's business.  (*Id.*)  Additionally, Plaintiff was in charge of the Arlington

facility's overall maintenance, including inspection, repair, and replacement of equipment as needed.  (*Id.*)  Two maintenance technicians worked under Plaintiff's supervision, and they reported to him.  (*Id.*)  The prior FSM was Caucasian, and he had two maintenance technicians report to him as well.  (*Id.*)  According to Plaintiff, all FSMs working for Defendant felt undermanned, and when he asked Moyer for additional manpower, he was told it was not in the budget.  (*Id.*)

Fred Walker ("Walker"), Defendant's National Facilities Service Manager, supervises all of the FSMs.  (*Id.*)  On October 22, 2007, Walker sent an email to all FSMs, including Plaintiff, regarding neglect of condensers at various facilities.  (*Id.* at 3.)  His email included statements that he had observed serious neglect on evaporative condensers at various facilities in the area. (*Id.*)  Moreover, he noted that "all professional FSM[s] should know about and regularly check for" these types of defects.  (*Id.*)  He stated that all condensers needed to be inspected daily, and action needed to be taken within a reasonable time once problems were detected.  (*Id.*)  He also required the FSMs to follow up to ensure that the condensers were receiving the proper attention. (*Id.*)  Importantly, he noted that "if any of these 'Gross Neglect' type items are discovered in a facility under your care, possible disciplinary action can occur."  (*Id.*)

After receiving Walker's email, Plaintiff inspected his condensers and found tubing heavily coated with mud and dirt.  (*Id.*)  He did not know the source of the mud and dirt until later that week, when he observed a stream of water running across the parking lot and determined that the water was coming up from underneath the parking lot.  (*Id.*)  Plaintiff then began the lengthy process of repairing the conveyor line and shutting down the condensers.  (*Id.*)

3

It is undisputed that Plaintiff saw approximately eight to ten inches of mud built-up in the condenser pans.  (*Id.* at 3.)

Defendant cites to Plaintiff's deposition testimony in support for its assertion that Plaintiff indirectly took the blame for the mud and dirty water in the condensers: "I am not saying that it wasn't my – it wasn't my fault, per se; but I had no idea that that dirty water was being pumped up there until, like I say, I found the problem underground."  (*Id.*; Dep. of Pl., D.E. # 21-3, at 18.)[1]  Plaintiff disputes the inference "that he took blame for a busted water line on the parking lot of the facility" because he discovered the water "springing up through the parking lot."  (Pl.'s Resp. to Def.'s Facts, D.E. # 25-1, at 1.)[2]  In his deposition, Plaintiff stated that the condenser looked neglected: "that dirty water slowly going up there caused the condenser to look like it had never been touched since it was put in place."  (Def.'s Statement of Material Facts, D.E. # 21-2, at 3; Dep. of Pl., D.E. # 21-3, at 19.)  Plaintiff attempts to dispute that he was the source of the neglect rather than the dirty water from the broken pipe: he cites to the following portion of his deposition in support of that assertion: "the damage had already been done because they had distributed that muddy water over those coils."  (Pl.'s Resp. to Def.'s Facts, D.E. # 25-1, at 2; Dep. of Pl., D.E. # 21-3, at 35.)

---

[1]    When the Court cites to Plaintiff's deposition, it will refer to the page numbers in the ECF filing system.

[2]    Plaintiff's Statement of Disputed Material Facts is riddled with formatting, typographical, and grammatical errors and otherwise fails to conform to the requirements of the Local Rules.  *See* Local Rule 56.1(b) (noting that "[a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant [in three separate ways]").  Moreover, "each disputed fact must be supported by a specific citation to the record."  *Id.*

Plaintiff provides responses to only five or six of Defendant's fifty undisputed facts, only some of which are accompanied by citation to the record.  The Court will assume that Plaintiff does not dispute the remaining forty-four or forty-five of Defendant's facts.

Defendant submits that, in early January of 2008, Defendant's Regional Engineer inspected Plaintiff's facility and saw that a drain pan was damaged.  (Def.'s Statement of Material Facts, D.E. # 21-2, at 4.)  Plaintiff disputes that Defendant learned of the damaged drain pan in January of 2008; he asserts that it knew about the broken drain pan "prior to [his arrival at] the plant."  (Pl.'s Resp. to Def.'s Facts, D.E. # 25-1, at 2; Dep. of Pl., D.E. # 21-3, at 30.)  Although Plaintiff fails to cite to the proper portion of his deposition, the Court discerns that Plaintiff stated that, even though he knew the drain pan was damaged in 2006 when he arrived at the facility, "the money wasn't in the budget to get it fixed."  (Pl.'s Resp. to Def.'s Facts, D.E. # 25-1, at 2; Dep. of Pl., D.E. # 21-3, at 30.)  Thus, Defendant states that Plaintiff had known of the damaged drain pan for years.  (Def.'s Statement of Material Facts, D.E. # 21-2, at 4.)

In January of 2008, Moyer resigned, and Dan Pritchard ("Pritchard") replaced him.  (*Id.*)  Pritchard was the General Manager at Defendant's facility in Murfreesboro, Tennessee, and when he added responsibilities at the Arlington facility, he was promoted to Regional Manager.  (*Id.* at 5.)  When Pritchard started working at the Arlington facility, Plaintiff admits that the condensers still looked as if they had not been touched in awhile.  (*Id.*)  When Pritchard first arrived at the Arlington plant, he discovered that it was in poor condition from a maintenance standpoint.  (*Id.*)  In addition to the badly neglected condensers, Pritchard identified ten defects and problems with the facility's various pieces of equipment.  (*Id.*)

In his deposition, Plaintiff stated that he and Pritchard were talking about the differences between the Murfreesboro and Arlington facilities' conditions and the facilities' overall conditions when Pritchard "stopped [all of a sudden] and said, look, I don't trust you.  It is not because I don't know you — It is not because — it is just because I don't know you, is the

reason I don't trust you."  (Dep. of Pl., D.E. # 21-3, at 80.)  In his declaration, Pritchard denied

saying that he did not trust Plaintiff.  (Decl. of Pritchard, D.E. # 21-5, at 5.)  Plaintiff believed

that Pritchard mistreated him because he was undermanned, and Pritchard did not provide him

more manpower after Plaintiff brought that to his attention.  (Dep. of Pl., D.E. # 21-3, at 2.)

"Other than not wanting to listen to anything [Plaintiff] had to say, . . . nothing [Plaintiff] said to

him made a difference. [Pritchard] didn't want to hear it."  (*Id.*)

Defendant submits that Pritchard also discovered that an evaporator drain pan needed to

be replaced due to neglect and that Plaintiff had inappropriately cut and removed the drain lines

from two other evaporators.  (Def.'s Statement of Material Facts, D.E. # 21-2, at 5.)  These

repairs cost more than $15,000 in replacement parts alone, and Defendant immediately budgeted

for these items to ensure Rich's satisfaction and the proper operation of the Arlington facility.

(*Id.* at 5-6.)  Plaintiff disputes this fact by asserting that he did not cut the drain lines from the

evaporator, but he does not cite to the record in support of this assertion.  (Pl.'s Resp. to Def.'s

Facts, D.E. # 25-1, at 2.)  Although Plaintiff numbered his next disputed fact as # 31, the Court

believes that Plaintiff continued to attempt to dispute Defendant's fact # 30.  Plaintiff references

the muddy water running across the parking lot due to the "break in the line" and argues that he

"tried to explain to . . . Pritchard what had occurred but he did not want to hear anything [he] had

to say. . . . Moyer and Bob Ke[i]thley [("Ke[i]thley")] the general manager was [sic] aware of

what happened to the parking[.]"  (*Id.* at 2-3.)  However, Plaintiff fails to cite to the record for

this assertion, and his next referenced citation is to pages 178-179 of his deposition.  However,

Plaintiff failed to provide the Court with a copy of his deposition, and pages 178-179 are absent

from the excerpts properly provided by Defendant.

6

This need for replacement parts disturbed Pritchard because the Arlington facility opened three years after the Murfreesboro facility, and Pritchard's Murfreesboro facility did not need any of these replacements.  (Def.'s Statement of Material Facts, D.E. # 21-2, at 6.)  Rich informed Pritchard that it was upset about the conditions of the Arlington facility and required Defendant to agree to create an upkeep list, which promised to correct all of these issues and bring the facility up to proper standards within ninety days and provide for quality control checks every thirty days.  (*Id.*)  Plaintiff does not dispute that various maintenance issues plagued the Arlington facility at the time Pritchard became responsible for the facility.  (*Id.*)

These issues suggested to Pritchard that Plaintiff had not been performing interval-required inspections; for example, the frozen drain lines in the air units indicated to him that Plaintiff had not performed the six-month air unit inspections as required.  (*Id.*)  Plaintiff disputes that he failed to perform inspections and notes that he made every effort to explain the origin of the damage done by the broken water line.  (Pl.'s Resp. to Def.'s Facts, D.E. # 25-1, at 3.)  He asserts that Pritchard had no interest in hearing from him.  (*Id.*)  Again, in support of these assertions, Plaintiff cites to portions of his deposition which are not before the Court.[3]

Pritchard asked David Bryant ("Bryant"), the FSM at the Murfreesboro facility, to complete a formal inspection of the Arlington facility and prepare a report of his findings. (Def.'s Statement of Material Facts, D.E. # 21-2, at 7.)  Bryant's report identified many serious problems with the equipment at the Arlington facility.  (*Id.*)  Plaintiff read Bryant's report and

---

[3]     Plaintiff also submitted two paragraphs to attempt to dispute this fact indicating that he was brought to the Arlington plant to repair equipment so they could get the product out of the building.  He asserts that Moyer told him that Defendant would have lost the Rich contract if Plaintiff had not made the repairs he did so that the plant could operate.  However, Plaintiff provides no citation to the record in support of this assertion.

did not disagree with any of its conclusions.  (*Id.*)  Then, on February 19, 2008, Keithley, Defendant's Regional Facilities Services Director, sent an email to Plaintiff informing him that a number of items needed Plaintiff's immediate attention.  (*Id.*)  Although Keithley's email directed Plaintiff to send updates as items were completed, Plaintiff does not recall discussing the matter with him or sending any updates to Keithley as required.  (*Id.*)  In February of 2008, Keithley also completed a Care and Appearance Detail Scorecard ("the Scorecard") which evaluates the appearance and condition of various items throughout the facility on an annual basis.  (*Id.*)  Plaintiff never discussed the Scorecard with Keithley, but he agreed that he was responsible for those items not completed, which were marked on the Scorecard with an "N." (*Id.* at 8.)

On March 7, 2008, Walker sent another email to all FSMs, including Plaintiff.  (*Id.*)  In his email, he reminded the FSMs that "lack of sound basis care to the condensers in our Refrigeration System would not be tolerated."  (*Id.*)  Walker noted that regularly scheduled inspections and cleaning of the condensers were critical to the operation of the refrigeration systems and were a condition of the FSMs' employment.  (*Id.*)  He also reiterated some of the regularly-required inspections and attached photos indicating that conditions that "are 'just plain unacceptable' and will not [be] tolerated."  (*Id.*)  The photos were of Plaintiff's facility, and Plaintiff knew that Walker's comments were directed at him.  (*Id.*)  He stated, "Most definitely. With the pictures that were sent to him, without a doubt.  I mean, I concurred.  I mean, it wasn't a secret.  I mean, I myself didn't send those pictures to him, but I was making the corrections on getting that condenser back into working condition."  (*Id.*)

By early March, Pritchard had reviewed Bryant's report and Keithley's Scorecard, made his own observations about the conditions of the facility and its equipment, observed Plaintiff's work for more than a month and saw a lack of progress, and compared all of this information to Bryant's equipment's condition at the Murfreesboro plant.  (*Id.*)  Pritchard discussed the situation with several of Defendant's employees, including Walker and Keithley.  (*Id.*)  At this meeting, they discussed Bryant's report, Keithley's Scorecard and email to Plaintiff, Plaintiff's complete failure to comply with Walker's directives to maintain all condensers in good operating order, and Pritchard's observations.  (*Id.* at 9.)  The group did not discuss Moyer's knowledge about the issues at the facility or whether he budgeted for Plaintiff to make repairs.  (*Id.*)

The group determined that the facility's maintenance deficiencies were so significant and had persisted for so long that they did not have confidence in Plaintiff's ability or willingness to correct all of these issues.  (*Id.*)  They believed that a change in management of the facility was necessary.  (*Id.*)  On March 11, 2008, Pritchard informed Plaintiff that Defendant was terminating his employment.  (*Id.*)  Defendant then transferred Mike Catalano ("Catalano"), a Caucasian male working as an FSM at another facility, to the Arlington facility to replace Plaintiff.  (*Id.*)  Pritchard was familiar with Catalano's diligent management as a maintenance employee while working at the other facility.  (*Id.*)

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that the

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[4]

---

[4]        Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[5]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but instead must present some "specific facts showing that there is a genuine issue for trial."[6]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[7]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[8]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[9]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[10]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[11]

---

[5]    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[7]    *Matsushita*, 475 U.S. at 586.

[8]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[9]    *Id.* at 251-52.

[10]    *Celotex*, 477 U.S. at 322.

[11]    *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

## ANALYSIS

### Claims Against Pritchard

Federal Rule of Civil Procedure 4(m) ("Rule 4(m)") provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."[12]  Here, the Court has not ordered Plaintiff to show cause as to why his claims against Pritchard should not be dismissed, but Defendant moved for dismissal of those claims in its Motion on February 29, 2012, as required by Rule 4(m).[13]  Since that time, Plaintiff has not effectuated service of the summons and Complaint on Pritchard, and Pritchard has yet to appear in the action.  The docket does not reflect that summons was ever issued as to Pritchard.  Thus, more than 120 days have passed since the filing of Plaintiff's Complaint on December 21, 2010, and there is no evidence that Plaintiff has served Pritchard.  Therefore, the Court dismisses without prejudice all of Plaintiff's claims against Pritchard under Rule 4(m), and Defendant's Motion is **GRANTED** in this regard.

### THRA

The THRA is Tennessee's state-law corollary to Title VII, and it "safeguard[s] all individuals within the state from discrimination because of race, creed, color, religion, sex, age, or national origin in connection with employment . . . ."[14]  The THRA carries a one-year statute of limitations; as such, for a plaintiff's suit under the THRA to be timely, he or she "must file

---

[12]        Fed. R. Civ. P. 4(m).

[13]        (Def.'s Mot., D.E. # 21-1, at 2 n.1.)

[14]        Tenn. Code Ann. § 4-21-101(a)(3).

11

suit within one (1) year after the alleged discriminatory practice ceases."[15]  Defendant argues that

Plaintiff's THRA claim is time barred.  Plaintiff's March 11, 2008, termination is the event he

believes was discriminatory, and Plaintiff did not file his claim under the THRA until December

21, 2010.[16]  Plaintiff did not respond to this argument.  Because Plaintiff was terminated on

March 11, 2008, for his THRA claim to be timely, he would have needed to file it on or before

March 11, 2009.  Because he failed to do so, Plaintiff's THRA claim is time-barred.

Accordingly, Defendant's Motion for Summary Judgment on this claim is **GRANTED**.

## IIED

IIED claims in Tennessee carry a one-year statute of limitations.[17]  As such, for a

plaintiff's IIED claim to be timely, he or she must file suit within one (1) year of when he or she,

in the exercise of reasonable diligence, discovered or should have discovered the existence of his

or her IIED claim.[18]  Defendant argues that Plaintiff's IIED claim is time-barred.  Again, the

event for which Plaintiff allegedly suffered emotional distress was his termination from

Defendant on March 11, 2008.  Because Plaintiff was terminated on March 11, 2008, for his

IIED claim to be timely, he would have needed to file it on or before March 11, 2009.  Because

he failed to do so, Plaintiff's IIED claim is time-barred.  Accordingly, Defendant's Motion for

---

[15]     *Id.* § 4-21-311(d).

[16]     (Def.'s Mot., D.E. # 21-1, at 3.)

[17]     Tenn. Code Ann. § 28-3-104(a)(1).

[18]     *See Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998).

Summary Judgment on this claim is **GRANTED**, and the Court need not reach Defendant's arguments related to the merits of Plaintiff's IIED claim.[19]

### Title VII § 2000e-2(a)(2)

In Plaintiff's Complaint, he alleged that Defendant had limited, segregated, and classified him in such a way as to deprive him of employment opportunities or otherwise affect his status as an employee because of his sexual orientation.[20]  Title VII prohibits employers from "limit[ing], segregat[ing], or classify[ing their] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."[21]  Defendant argues that, during Plaintiff's deposition, Plaintiff's counsel stated that the Count regarding Plaintiff's sexual orientation was a typo and that Plaintiff is asserting no such claim.[22]  Plaintiff did not respond to this argument.  Therefore, the Court finds that because Plaintiff's counsel agreed with Defendant's counsel's statement that "there is no allegation in this case of sexual orientation,"[23] Plaintiff did not assert a claim for a breach of § 2000e-2(a)(2).  Therefore, any claim under this section of Title VII was accidentally in the Complaint, and Defendant's Motion for Summary Judgment on this claim is **GRANTED**.

### 42 U.S.C. § 1981 and Title VII § 2000e-2(a)(1)

---

[19]     (*See* Def.'s Mot., D.E. # 21-1, at 4 n.4.)

[20]     (Compl. ¶ 21.)

[21]     42 U.S.C. § 2000e-2(a)(2).

[22]     (Def.'s Mot., D.E. # 21-1, at 2 n.2.)

[23]     (Dep. of Pl., D.E. # 21-3, at 5.)

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."[24] These rights are also protected "against impairment by nongovernmental discrimination and impairment under color of State law."[25]

Section 1981 is "generally invoked in the employment context for . . . claims of hostile [work] environment, failure to promote, or wrongful dismissal;" other common situations involving § 1981 litigation include claims of discrimination in retail and service settings.[26] Courts in the Sixth Circuit have adopted slightly different prima facie cases depending upon the specific discrimination asserted under § 1981.[27]  For an employment-based claim involving circumstantial evidence of discrimination, the elements of a prima facie case as well as the allocations of the burden of proof are the same as those under Title VII.[28]

Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."[29]  Plaintiffs may establish discrimination in one of two ways: through the

---

[24]     42 U.S.C. § 1981(a).

[25]     *Id.* § 1981(c).

[26]     *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

[27]     *See, e.g.*, *id.* at 872.

[28]     *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

[29]     42 U.S.C. § 2000e-2(a)(1).

use of direct evidence or through circumstantial evidence using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[30]  Here, Plaintiff has not presented direct evidence of race discrimination; therefore, he must prove his case with circumstantial evidence.  Under *McDonnell Douglas*, a prima facie case consists of four elements: (1) membership in a protected class; (2) that the plaintiff was qualified for the job; (3) that he or she suffered an adverse employment action; and (4) that he or she was treated differently than similarly situated employees of a different race.[31]  To be qualified for the job, a plaintiff must "show that h[is or her] performance met [his or her] employer's legitimate expectations at the time of her discharge."[32]  Additionally, at the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job.[33]  Plaintiffs meet their prima facie burden by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field.[34]  Courts focus on the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.[35]

---

[30]     *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 835 (6th Cir. 2012).

[31]     *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).

[32]     *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) (citing *McClain v. N.W. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 334 (6th Cir. 2006)).  In *Vincent*, the Sixth Circuit found that plaintiff was qualified for her position as a laborer and crew leader when she produced evidence, including statements from her coworkers supervisors, indicating that she was a capable laborer and crew leader.  *Id.*

[33]     *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003).

[34]     *Id.* at 575-76.

[35]     *Id.* at 576.

If a plaintiff can establish these four elements of the prima facie case of discrimination, "the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for the adverse action."[36]  This reason should be "reasonably informed and considered."[37]  If the defendant meets that burden of production, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was merely a pretext for discrimination.[38]  There are three bases for a defendant's reason to be pretextual: (1) it has "no basis in fact," (2) it "did not actually motivate the adverse action," or (3) it "was insufficient to motivate the adverse action."[39]  If the plaintiff can show that the defendant's "proffered, nondiscriminatory reason was pretextual, unlawful retaliation may be inferred and she would be entitled to take her claim to a jury."[40]  Throughout this entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion.[41]

It is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated.  Moreover, he was replaced by Catalano, an individual outside the protected class.  Therefore, Plaintiff has satisfied three of the four elements of his prima facie case; Defendant challenges the third element: that he was qualified for his position as an FSM.

---

[36]     *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 202 (6th Cir. 2004).

[37]     *Wexler*, 317 F.3d at 576.

[38]     *Kinamore*, 92 F. App'x at 202 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)).

[39]     *Id.*

[40]     *Id.*  (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 344 (6th Cir. 1997)).

[41]     *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

In its Motion, Defendant argues that Plaintiff cannot establish a prima facie case of race discrimination.  Defendant submits that Plaintiff did not meet its legitimate expectations at the time of his termination.[42]  It avers that Walker's October 2007 email sets forth Defendant's legitimate expectations of its FSMs, which included overall maintenance of the facility, including the inspection, repair, and replacement of equipment as needed.[43]  Moreover, Defendant points to Plaintiff's failure to respond to Keithley's email by sending him the requested updates as further evidence of his failure to meet its legitimate expectations.[44] Defendant argues that Moyer's tolerance of Plaintiff's poor performance is irrelevant given Plaintiff's acknowledgment that he was responsible for maintenance and timely repair of the problems pointed out by Pritchard, Keithley, Bryant, and Walker.[45]  Thus, Defendant submits that Plaintiff cannot make out a prima facie case of discrimination.

If Plaintiff can prove his prima facie case, Defendant states that it has a legitimate, nondiscriminatory reason for terminating Plaintiff: "the maintenance deficiencies for which Plaintiff was responsible were so significant and had persisted for so long that it no longer had confidence in Plaintiff's ability or willingness to correct all of these issues and believed a change in manager of the maintenance functions at the Arlington facility was necessary."[46]  Furthermore, Defendant argues that Plaintiff cannot establish pretext.  Because Plaintiff admitted the existence

---

[42]     (Def.'s Mot., D.E. # 21-1, at 5.)

[43]     (*Id.* at 6.)

[44]     (*Id.*)

[45]     (*Id.* at 6-7.)

[46]     (*Id.* at 8.)

of all of the maintenance deficiencies relied upon by Defendant, it states that he cannot suggest that its proffered reason has no basis in fact.[47]  Thus, Plaintiff would have to demonstrate a question of fact as to pretext one of two other ways: because the proffered reason did not actually motivate or was insufficient to motivate Defendant's action.

Defendant systematically refutes five possible motivations for his termination which Plaintiff put forth at his deposition.  First, Defendant points out that Plaintiff stated that Pritchard had not trusted him, but this reason does not suggest a racial bias on Pritchard's part.[48]  Second, Plaintiff cannot establish pretext by pointing to disparate treatment in the number of maintenance technicians assigned to each facility because all FSMs believed they were undermanned.[49] Third, Plaintiff has not demonstrated that the individuals who decided to terminate him had prior knowledge of Moyer's failure to make the timely resolution of the facility's problems a priority.[50] Moyer was fired months before Plaintiff, and the maintenance situation did not improve in the intervening time.  Fourth, Plaintiff's Caucasian predecessor was terminated for the same reason as Plaintiff: equipment neglect.[51]  Finally, Plaintiff's idle speculation that Pritchard terminated mostly African-American employees is unfounded for two reasons:

---

[47]        (*Id.* at 9.)

[48]        (*Id.* at 9-10.)

[49]        (*Id.* at 11.)

[50]        (*Id.* at 11.)

[51]        (*Id.* at 12.)

Pritchard did not act alone when the group decided to terminate Plaintiff, and Plaintiff offered no statistical evidence to support his speculations.[52]

In response, Plaintiff argues that he satisfies the first element of his prima facie case because "the employers [sic] l'legitimate [sic] expectations were met as a broken drain pan for which [Plaintiff] is blamed was broken prior to [Plaintiff] ever moving to the Arlington Plant."[53] Plaintiff seizes on Defendant's statement that it did not know what Moyer knew or didn't know and interprets this statement as admitting that Moyer, and possibly Keithley and Walker, may have known about the condition of the Arlington Plant.[54]  Plaintiff avers that "at least two [people [sic] present in that meeting knew about the conditions that they themselves, superiors of [Plaintiff,] had allowed to exist in the Arlington Plant.[55]

As to the pretext portion of his claim, Plaintiff appears to argue that, because Pritchard stated that he did not trust Plaintiff before his termination, pretext results.[56]  Without citation to the record, Plaintiff again asserts that he had saved the contract with Rich by maintaining material handling equipment and conveyor lines.[57]  He also believes that "Keithley and . . . Walker began to pretend they had not known for three years about a broken drain pan and pretended they did not know about the busted water pipe discovered by Plaintiff . . . in the

---

[52]     (*Id.* at 13.)

[53]     (Pl.'s Resp., D.E. # 24, at 4.)

[54]     (*Id.* at 4-5.)

[55]     (*Id.* at 5.)

[56]     (*Id.* at 6.)

[57]     (*Id.* at 7.)

[p]arking [l]ot."[58]  Plaintiff states that when he tried to speak with Pritchard to explain "the history with the condensers and lines," Pritchard did not wish to speak with him.[59]

In reply, Defendant begins by arguing that Plaintiff's Response was untimely and should be disregarded.[60]  Defendant notes that Plaintiff's Response to Defendant's Statement of Material Facts fails to comply with the Local Rules and that Plaintiff fails to cite to record evidence to demonstrate why Defendant's asserted facts are incorrect.[61]  Defendant points out that Plaintiff's Response fixates on the knowledge of Moyer, Keithley, and Walker regarding a broken drain pan but does not address the other evidence demonstrating that he failed to meet Defendant's legitimate expectations.[62]  Thus, Defendant argues that Plaintiff has failed to make out a prima facie case.  Additionally, Defendant asserts that Pritchard's statement about not trusting Plaintiff does not suggest a racial bias.[63]

The Court finds that Plaintiff has failed to make out a prima facie case of race discrimination: he has not demonstrated that he was qualified for his FSM position or that he satisfied Defendant's reasonable expectations.  Defendant reasonably expected its Arlington

---

[58]      (*Id.*)

[59]      (*Id.*)

[60]      (Def.'s Reply, D.E. # 27, at 1.)  In its Order Granting Plaintiff's Motion for an Extension of Time, the Court gave Plaintiff until April 4, 2012, to file his Response.  However, Plaintiff filed his Response on April 9, 2012, without explanation or excuse.  While the Court is not required to consider documents which are untimely filed, the interests of justice require the Court to consider the arguments in Plaintiff's Response.

[61]      (*Id.* at 2.)

[62]      (*Id.* at 3.)

[63]      (*Id.* at 5.)

facility to be kept in good repair; for that reason, it transferred Plaintiff to the facility in 2006 to fix the problems left by Plaintiff's predecessor.  Moreover, those expectations were communicated to Plaintiff in Walter's October 2007 email, Keithley's February 2008 email, and Walker's 2008 email.  That the facility remained in disrepair from 2006 until Moyer's resignation in January of 2008, even though Plaintiff said that he brought problems to Moyer's attention that were not fixed for budgetary reasons, does not suffice to prove that Plaintiff was qualified for his position *at the time of his termination*.

Several events occurred between January and March of 2008: Defendant hired Pritchard, Keithley sent an email requesting maintenance progress updates to which Plaintiff did not remember responding, and other individuals toured the Arlington facility and observed its continued disrepair.  Moreover, Plaintiff did not provide evidence indicating that he performed the required inspections: he merely pointed out that he tried to explain the damage from the broken water line.  But the broken water line was not the source of all of the facility's maintenance problems as identified by Pritchard, Bryant, and Keithley.  Pritchard identified ten different maintenance issues needing attention; only two of those were the broken drain pan and muddy condenser lines upon which Plaintiff focuses.  Moreover, Plaintiff does not state that he did not know about these problems or that he tried to timely repair them.  Nor can Plaintiff justify his failure to maintain the facility due to a lack of manpower; Plaintiff himself stated that all FSMs felt undermanned, yet their facilities were not in as bad of shape as his.  And Plaintiff had the same number of maintenance technicians as his predecessor, a Caucasian who was fired for neglecting to properly maintain the facility's equipment.

Furthermore, Plaintiff did not present credible evidence that he met the minimum objective criteria for employment as an FSM.  Part of the FSMs' duties were to maintain the equipment at Defendants' facilities in good condition to the satisfaction of Defendants' customers; Rich was dissatisfied with the condition of the Arlington facility under Plaintiff's management.  Although Plaintiff had maintenance experience at Defendants' East Parkway facility, he had no prior FSM experience until he was promoted in 2006.  As evidenced by the Arlington facility's continued disrepair under both Moyer and Pritchard and Plaintiff's failure to present evidence that he followed Keithley's instructions regarding timely updates about repairs to the Arlington facility, the Court finds that Plaintiff was not qualified for his position as an FSM at the time of his termination.

Plaintiff's arguments that Defendant's managers may have known about the condition of the Arlington facility prior to January 2008 are unpersuasive.  Such idle speculation without citation to the record is unavailing.  Moreover, Defendant terminated Plaintiff's predecessor for failing to properly maintain the facility, and Moyer resigned with the facility in disrepair.  Under both Moyer and Pritchard, the undisputed facts indicate that Plaintiff failed to address maintenance issues, as the maintenance problems continued to exist.  Accordingly, the Court is unpersuaded by Plaintiff's arguments.

From Plaintiff's deposition testimony, it appears to the Court that Plaintiff fixates on his attempts to repair the muddy condenser and the broken water pipe as proof that he satisfied the Defendant's legitimate expectations of its FSMs.  However, even after Keithley's February 2008 email containing a detailed list of required maintenance and requesting feedback as jobs were completed, Plaintiff has no recollection of whether he sent Keithley updates as required.  Thus,

Plaintiff has failed to present evidence that he did provide the required maintenance and feedback and that he met Defendant's legitimate expectations at the time of his termination. Accordingly, Plaintiff did not comply with the requirements of his FSM position, and he has not created a question of fact as to whether he met Defendant's legitimate expectations.[64]  Therefore, he has failed to meet the first element of his prima facie case.

Even if Plaintiff could meet the first element of his prima facie case, the Court finds that Defendant has come forward with a legitimate, nondiscriminatory reason for Plaintiff's termination:  "the maintenance deficiencies for which Plaintiff was responsible were so significant and had persisted for so long that it no longer had confidence in Plaintiff's ability or willingness to correct all of these issues and believed a change in manager of the maintenance functions at the Arlington facility was necessary."[65]  Given the plethora of maintenance issues at the Arlington facility and Pritchard, Bryant, and Keithley's independent observation of them, the Court finds that this legitimate, nondiscriminatory reason was "reasonably informed and considered."

Moreover, Plaintiff has failed to demonstrate pretext.  He has not shown that Defendant's legitimate nondiscriminatory reason has no basis in fact, as he admitted that the maintenance issues at the Arlington facility as identified on the Scorecard existed and were his responsibility.

---

[64]     Plaintiff's arguments' form is faulty as well.  Throughout Plaintiff's nine-page Response, he often fails to cite to portions of the record.  Moreover, the Response is replete with grammatical errors and is nearly nonsensical at times.  The Court will not permit Plaintiff to conjure an issue of fact from his own deposition testimony and others' statements which are wholly absent from the record.  Unlike *Vincent*, Plaintiff has not submitted evidence from coworkers or other managers indicating that he met Defendant's legitimate expectations.

[65]     (Def.'s Mot., D.E. # 21-2, at 8.)

Nor can Plaintiff show that his alleged inability and unwillingness to correct maintenance issues was insufficient to motivate his termination, as Rich, one of Defendant's customers, required maintenance updates on the conditions of the Arlington facility.  Defendant required its FSMs to maintain equipment and facilities to its customers' specifications, and Defendant budgeted to have the drain pan and lines replaced to Rich's satisfaction immediately upon Pritchard's discovery of the broken drain pan.  Thus, Plaintiff is left with demonstrating that Defendant's reason did not actually motivate his termination.  Plaintiff's arguments on this issue fail.

Plaintiff removes one of Pritchard's statements from its context and argues that Pritchard did not trust him because of his race, and it is for that reason that Pritchard persuaded the group to fire Plaintiff.  Although it is disputed whether Pritchard stated that he did not trust Plaintiff, this dispute does not relate to a material fact once Pritchard's alleged statement is viewed in context.  After stumbling over his words, Pritchard stated that he did not trust Plaintiff because he didn't know him.  A lack of familiarity with an individual does not equate to racial bias sufficient to create a question of fact as to pretext.  Therefore, the Court finds that, even if Pritchard stated that he did not trust Plaintiff, that lack of trust stemmed from his lack of familiarity with Plaintiff rather than any sort of prohibited bias.  Accordingly, Plaintiff has not presented evidence sufficient to create a question of fact as to whether Plaintiff's failure to maintain the facility actually motivated Pritchard and the group of decisionmakers to terminate Plaintiff.

Thus, even if Plaintiff could make out a prima facie case of race discrimination, Defendant has presented a legitimate, nondiscriminatory reason for Plaintiff's termination, and

Plaintiff has failed to demonstrate pretext.  Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

                                        **s/ S. Thomas Anderson**
                                        S. THOMAS ANDERSON
                                        UNITED STATES DISTRICT JUDGE

                                        Date: May 2, 2012.